24 C.C.P.A. (Patents)

### RUDOLPH v. GAWILER.

Patent Appeal No. 3794.

**Court of Customs and Patent Appeals.**

April 5, 1937.

William S. Hodges, of Washington, D. C., for appellant.

Richard J. Cook, of Seattle, Wash., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office in an interference proceeding in which priority was awarded to the appellee, John Gawiler, on all counts in the interference, which said decision affirmed the decision of the Examiner of Interferences. The subject matter of the interference is expressed in four counts. Count 4 is typical of all the counts, and indicates the subject matter of the interference. It is as follows: "4. A vent protector for egg laying hens comprising a plate, a fastening device in the form of a safety pin fixed rigidly to the top edge of the plate in a manner whereby the pin may be applied through the rump of the hen thereby to operatively suspend the plate over the vent; the said plate being longitudinally curved to conform to the adjacent body part of the hen and being adapted to swing outwardly for passage of an egg from the vent."

The appellee resides at Toppenish, in the county of Yakima, in the state of Washington, and on January 22, 1932, filed an application for patent on a device to protect the vent of a hen while laying an egg. On June 29, 1933, Maurice L. Rudolph, a resident of Vineland, in the county of Cumberland, in the state of New Jersey, filed an application for a patent for a similar device. Thereafter, on or about November 8, 1933, two interference proceedings were instituted and declared between the application of the party Rudolph and pending applications of Perl Acton, filed July 19, 1933, Meyer N. Dantzig, filed August 26, 1932, and the application of the party Gawiler, filed as aforesaid. On or about October 15, 1934, the parties Acton and Dantzig were eliminated from the interferences, and these later were consolidated into one interference, interference No. 67,223.

Both parties took testimony which will be hereinafter considered. At the conclusion thereof, the Examiner of Interferences was of opinion that the junior party, the appellant, had not sustained the burden of proof resting upon him and awarded priority to the party Gawiler. On appeal to the Board of Appeals, the Board arrived at the same conclusion.

The subject matter of the controversy here is a shield of metal to protect the vent of an egg-laying hen. According to the facts produced, when a hen, especially of the white leghorn variety, lays an egg, the vent is much distended and shows a red appearance, because of the lining mucous membrane of the tube. The hen herself and other hens will be attracted by this appearance and peck at it, especially if the flow of some blood has been occasioned by the egg-laying process. This leads to cannibalism and to injuries which speedily kill the hen. Some of the witnesses testify that very large losses in egg-laying hens have been occasioned for many years because of these "pick-outs," and for many years it has been a matter of serious loss to the poultry farmer. Many experiments have been tried and remedies recommended, usually consisting of recommendations as to the feeding of the hens. Various departments of agriculture and poultry organizations have experimented along these lines, but without apparent success. Very large percentages of birds were lost in this way, in some cases the losses on the farm of the party Gawiler, in a single season, amounting to as many as 500 birds.

Both tribunals of the Patent Office seem to base their conclusions largely upon the character of the evidence produced on behalf of the junior party, and have concluded that it is uncertain and insufficient to overcome the burden which is placed upon the appellant as junior party. It, therefore, becomes necessary for this court to examine the testimony.

The appellee, Gawiler, is a farmer, principally engaged in raising poultry, at Toppenish, Wash., and had been residing there for thirteen years at the time of the taking of the testimony herein. He testified that he first conceived the idea of a method of protecting his laying hens from these "pick-outs" in attempting to prevent losses from that source. In 1925 he had about 3,000 laying birds in his flocks, and for some years he kept tables showing the losses from that source. In July, 1930, Gawiler had one bird which was wounded, which he removed from the house and attempted to protect by fastening a piece of canvas, 2½ inches by 3 inches, to the rump of the chicken, with a string. This, as he says, gave him a conception of a protecting shield, and from that time on he attempted to prepare one that would be satisfactory. In October of the same year he designed a shield made of a part of an inner tube, which was fastened to the rump by a piece of copper wire. These devices were not permanent, but would tear off.

The making of such devices was recorded in a chart which was offered in evidence.

In July, 1931, the other devices having failed to accomplish the desired purpose, Gawiler made a shield out of galvanized sheet iron, to which a hog ring was attached at the upper end. These were shield-shaped, large enough to cover the vent, and pointed at the top. The hog ring was inserted into a hole in the small end of the shield, and the ring closed through the flesh of the rump of the hen. This shield worked quite satisfactorily. It was offered in evidence. Thereafter Gawiler showed the shield to a large number of chicken raisers at his place, and made 20 or 30 of them, which were used. Gawiler was still attempting to produce a better shield, and "came on the idea of using a safety pin instead of the hog ring." Samples of these shields were offered in evidence. They were equipped with a No. 2 safety pin, around which the shield was crimped to hold it. The safety pin was inserted through the tip of the rump, laterally, so that the shield would hang directly downward and cover the vent.

Thereafter Gawiler began making shields for sale, and sold a considerable number of them. Some time in December, 1931, molds and dies were ordered from a machine shop in Yakima, Wash. The dies were offered in evidence, and in January, 1932, quantity production was initiated. Fifteen thousand shields were made from these dies at that time, and other dies were procured for greater production. Application for a patent was taken up with an attorney, Mr. Maddox, in November, 1931, and application was duly made.

The shields made by both the old and new dies were sold throughout the United States, and advertising in different poultry magazines was initiated. This was done in January, 1932. Answers were received from various places throughout the United States and orders were received at agencies at various places, one being received in the agency at Washington, D. C. Among other correspondence which Gawiler had at that time was some with parties at Vineland, N. J., where the appellant resided at the time, and in which a party by the name of Everett Keen was attempting to become an agent for the sale of the shields. This letter was dated April 6, 1932. There were also two postal cards received from one Abe Crystal, at Vineland, one dated September 15, 1932, the other December 15, 1932, ordering shields and asking to be made an agent in that territory. On June 5, 1932, his correspondent, Keen, wrote Gawiler to the effect that the party Rudolph, living at Maple Avenue, Vineland, N. J., had started to make shields similar to Gawiler's. Thereupon Cook & Robinson, representing Gawiler, wrote to the appellant, who was then doing business under the name of Rudolph Pick-Out Shield Company, advising him that Gawiler was applying for a patent on the device which he was making, in response to which, on June 12th, the appellant replied that he had been experimenting with this idea for a number of years, and was intending to file an application for a patent.

A circumstance which has been given great weight by the tribunals of the Patent Office, and which appeals with equal force to this court, consists of an advertisement which was issued by Gawiler in marketing his shields. This was in June, 1932. It consisted of a small two-page leaflet. The drawings for the circular were made by A. J. Stahmer, of 72 Columbia street, Seattle, Wash., from a picture of a hen cut from a magazine and handed to Mr. Stahmer by Gawiler. This picture is printed upon one page of the leaflet, which is folded into four pages. On the interior of the leaflet is a representation of the rump and vent of a hen with a shield suspended from a safety pin inserted into the fleshy portion of the rump. These circulars were distributed generally, 5,000 being issued. They were released in June, 1932. Thereafter Gawiler received a circular from the party Rudolph, which is known in the record as Exhibit No. 23, and a comparison of which will be made with the Gawiler circular, known as Exhibit No. 20, hereinafter.

At the time of the taking of the testimony herein, the appellant was 23 years of age, and lived at Maple avenue and Spring road, Vineland, N. J. The appellant testified that he first conceived the idea embodied in his shield, which is a practical duplicate of the Gawiler shield, on or about July, 4, 1925, when he was 14 years of age. It does not appear that up to that time Rudolph had ever had any experience in farming, or in raising chickens of any kind. He was on a vacation at a poultry farm, and on that day the farmer, one Schultz, had a "pick-out." The farmer tried to protect the vent after the picking

was done by the use of a needle and thread passed into the tail head of the chicken, and to which was attached a piece of cloth. Rudolph watched him, and, as he sat looking at the box where the needle and thread were kept, he saw a safety pin, and it occurred to him that the pin would answer the same purpose. His father, he stated, had been a sheet metal worker for many years, and he thought that metal would be better than a cloth, so he procured a piece of a tin can, cut the same out by hand, and attached the safety pin to the top. He put vent holes in the shield to give the chicken air, and had the farmer put the shield on the chicken. He was not able to produce the shield, but states that the chicken died a few days later, and the chicken and shield were thrown away. He states, however, the shield was curved to fit the form of the chicken. Nothing further appears about his activity along this line until 1929, when he was 18 years of age, when he went to the poultry farm of a man by the name of Miller, who was his brother-in-law, and which farm was located at Vineland. He prevailed on Miller to try some shields which he made at that time, and which were substantially like those he says he first conceived.

In September, 1929, he claims Miller used some of these upon chickens for about a month, whereupon Miller sold his chickens and the shields were taken off. None of these shields were offered in evidence by him at that time, although Miller afterwards produced one. Rudolph also claimed that in 1931 he made some shields for his brother, practically the same as those formerly made by him, with a slight indentation to hold the safety pin more firmly. In 1932 the appellant went on a farm, and at the end of 1932 "and about the beginning of 1933" he sold some of his shields made by a machine which he had ordered in October, 1932. This machine was delivered in February, 1933. From that time, until the time application for patent was filed, he sold about 1,500. The party Rudolph claims that he delayed application for patent on account of lack of funds, and that as soon as he procured the necessary funds he filed the application, paying the fee with borrowed money. The farmer with whom the party Rudolph was staying at the time of his alleged conception was a man by the name of Schultz, who, although not a relative, was a close friend of Rudolph's father, and came from the same town in Russia. Rudolph testified that he got out his first advertising of his product in March, 1933; that the circular had the picture of a fowl on the outside cover; and that the circular was made by the Standard Printing Company, of Vineland.

On cross-examination, he stated that the picture of the fowl on the circular was furnished by the printing company which had a cut of a chicken, and stated that the drawings and the cut were made in Philadelphia, by the Atlas Photograving Company, located on Sansom street. These cuts, it is said, were made about the beginning of March, 1933. He also states that drawings were sent to him and that he "okayed" them, and from these the cuts were made. The first circulars, it is stated, were printed by John Daly, of Forty-Second and Ogden streets, Philadelphia, from the cut supplied by the Atlas Company in March, 1933. Thereafter, the witness corrected himself and stated that his first cuts were made by the Atlas Photograving Company and printed by John Daly, and that thereafter a new cut was used by the Standard Publishing Company, of Vineland, which had on it a statement that a patent was applied for. None of the drawings for these cuts were produced by the witness.

In support of the testimony of the party Rudolph, Jerome G. Miller testified that in 1929 Rudolph made some "pick-out" shields for his chickens on a small farm at Vineland, and produced one of the shields, which was introduced as Exhibit No. 2, and which is practically the shield of the issue. He states that Rudolph told him to throw the shields away when he sold his chickens, but that he still retained about five of them, one of which he had produced.

The witness Nathan Schultz testified that in 1925, on July 4th, Rudolph was at his place, made a tin shield, and put it on a chicken which had been suffering from a "pick-out"; that he made 5 or 6 shields, but that the chicken died, and he threw the chicken and all of the shields away, as he "did not want any further use of them."

Alfred A. Rudolph, a brother of the appellant, testified that the appellant had been at Mr. Schultz' place in July, 1925, and that the appellant, at that time, told him about having made a shield. He also corroborated his statements about his visit to Miller in 1929, and about having seen shields put on chickens at that time. He

also corroborated his brother as to what occurred at the witness' farm in 1931, and that, at that time, appellant made about 500 shields for him, and about his manufacture of the same in 1933. This witness also produced a shield which he claimed had fallen off of a hen at his place "about five or six months after September, 1931." This witness testified that the first drawing was made in March, 1933, and that he made most of the drawings; that he had told an artist that he "wanted a chicken made with a shield on it," and that he, the artist, did all the work.

It was incumbent upon the appellant under the facts in this case to prove at least by a preponderance of evidence that prior to January 22, 1932, appellee's date of filing, that he, the appellant, had conceived and reduced the subject matter of the interference to practice.

If we were to take the testimony of the appellant and the witnesses who testified for him at its face value, it would appear that sufficient proof has been made. However, there are so many circumstances arising in the case that we can find no fault with the tribunals of the Patent Office in failing to find that he has maintained the burden imposed upon him. The reasonableness or unreasonableness of the story told by the appellant must be taken into account. Small facts and circumstances oftentimes throw greater light on the true situation than can be afforded in any other way. When we look to the case, we find a party who, through many years, struggled to solve a problem which had been unsolved for years, and which was exceedingly troublesome. Finally, out of the experiences which he had, through years, and as a result of experimentation, study, and effort, he found a solution. On the other hand, we have a boy, fourteen years of age, city bred and raised, knowing nothing about chickens or farming, who, upon the first occasion that he discovers the presence of a problem, solves it instanter, and without apparent effort. Not only does he at once conceive of the method of prevention, but he seizes upon the materials, makes one, even puts ventilators in it, although, so far as his experience is concerned, it may need nothing of the kind. Time goes on, and he gives no more attention to it, and then, again, we find him making more of the same devices. He says that he saw a safety pin and thought at once that this could be used. To the or-

dinary person it would appear that this would be a cruel and painful thing to use. In fact, one of the Examiners in the Patent Office, on Gawiler's application, refused it at one time on that ground. However, this boy seems to have known at once that nothing of the kind would occur, and that it could be used without pain and without loss of egg-laying properties. Even after the hen upon which it was placed had died, and the hen and device had been thrown away, he still felt that the invention was a success and repeated it in 1929. Then, again, according to his story, we find him throwing the devices away which Miller had used, although unexpectedly five of them appear at the hearing.

The most significant fact, however, is found in the advertisements. That people in Vineland, which is shown to be a city of about 20,000 inhabitants, especially poultry raisers, knew of the Gawiler device before Rudolph began to manufacture them in quantities, is apparent from the communications which passed. It is not unreasonable to assume that Miller or Rudolph or his brother might have obtained this information, although they deny it. Two different people in the town desired to be agents, which indicates a considerable knowledge in that vicinity of Gawiler's device. When Gawiler prepared his advertising material, he procured some drawings to be made in the state of Washington, and sent out these leaflets. On the interior was a representation of the rump and vent of a hen with a shield attached by means of a safety pin. It is not an accurate drawing, and is quite rude. However, when in a short time thereafter Rudolph issued a similar leaflet, it was of exactly the same size, folded in the same manner, and contained upon the interior a practical duplicate of the rump and shield in the interior of Gawiler's pamphlet. Even the arrows which point to certain points of the device are drawn in the same manner, with the same curves, and every feather and shading is made in the same manner. The only difference is that the Rudolph shield is somewhat differently shaped and contains his name and "Patent pending." On one of the outer pages of the pamphlet appears in each case the representation of a chicken with a shield attached. They are exactly identical, with the exception of four small ventilator holes which appear in the shield on the Rudolph leaflet. The comb of the fowl, each

feather, each shading, the conformation of the ground, the representation of the foliage thereon, and each shading of the feathers is exactly the same in each case. There can be no doubt, under any circumstances, upon comparing these two cuts, that they were made from the same drawing, by the same person. Yet Rudolph and his witnesses testify that they were made by independent artists from suggestions made by him and his brother. The original cuts or drawings are not in evidence, and no attempt was made to bring the original artist who prepared the Rudolph cuts, although he was available, and his address was given.

We agree with the conclusion of the Patent Office tribunals, and the decision of the Board of Appeals is affirmed.

Affirmed.

HATFIELD, Associate Judge, did not participate in this case.